INDIANA INSURANCE GUARANTY ASSOCIATION, Appellant–Defendant,

v.

BEDFORD REGIONAL MEDICAL CENTER, Appellee–Plaintiff.

No. 47A01–0412–CV–504.

Court of Appeals of Indiana.

Jan. 26, 2006.

Rehearing Denied March 27, 2006.

Andrew W. Hull, Sean T. White, Hoover Hull Baker & Heath, LLP, Indianapolis, for Appellant.

R. Thomas Bodkin, Bamberger, Foreman, Oswald & Hahn, LLP, Evansville, for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

The Indiana Insurance Guaranty Association ("IIGA") appeals the trial court's entry of summary judgment in favor of Bedford Regional Medical Center ("BRMC"). We reverse.

### Issue

The issue is whether IIGA is obligated under the Indiana Insurance Guaranty Act ("the Act") to pay a claim for the lost wages of a deceased claimant.

### Facts and Procedural History

BRMC provided health care to James Brown from January 10, 1997, to January 13, 1997. At that time, BRMC was insured by PHICO Insurance Company against claims arising from BRMC's provision of health care. The policy limits were $100,000 per person and $300,000 per occurrence. On February 1, 2002, the Commonwealth Court of Pennsylvania ordered PHICO into liquidation.

Brown died on January 13, 1997. Prior to his death, he earned twelve dollars per hour and regularly worked forty hours per week. On December 11, 1997, Brown's estate ("the Estate") filed a proposed complaint against BRMC and others with the Indiana Department of Insurance. The Estate alleged, *inter alia,* that BRMC and its employees were negligent in providing health care to Brown and that he died as a proximate result of that negligence. On March 15, 2002, the Estate filed a complaint for wrongful death and medical malpractice against BRMC and others in the Monroe Circuit Court. BRMC and the Estate entered into a settlement agreement pursuant to which BRMC paid to the Estate $50,000 in cash and also paid $25,001 for an insurance annuity, which would generate future payments to the Estate in the total amount of $50,000.[1]

BRMC then sought reimbursement of the $75,001 from IIGA, a non-profit, unincorporated legal entity created by the

---

1. Pursuant to the version of the Indiana Medical Malpractice Act in effect at the time of Brown's death, the health care provider had to incur a cost of more than $75,000, with an eventual cash payout to the claimant of at least $100,000, for the claimant to be eligible to make a claim against the Indiana Patient's Compensation Fund. *See* Ind.Code §§ 34–18–5–3, –14–4.

Indiana legislature for the purpose of avoiding excessive financial loss and excessive delay in payment to claimants and policyholders because of the insolvency of an insurer. *See* Ind.Code §§ 27–6–8–2, –5. IIGA notified BRMC that the Estate's claim for lost wages in its underlying medical malpractice action against BRMC is not a covered claim under the Act because "the decedent cannot actually lose wages, because he is deceased." Appellant's App. at 47. On September 10, 2003, BRMC filed suit against IIGA, alleging that the Estate's future lost wages claim is a covered claim. On March 31, 2004, BRMC filed a motion for summary judgment. On June 4, 2004, IIGA filed a cross-motion for partial summary judgment. On November 5, 2004, the trial court entered an order granting summary judgment in favor of BRMC, finding "that the lost wage claim of the Estate of James Brown against BRMC is a covered claim and payable, to the extent of its policy limit, by IIGA." *Id.* at 12. On June 22, 2005, pursuant to a stipulation of the parties, the trial court entered another order in this matter, stating in pertinent part: "[BRMC] shall recover of and from [IIGA] the sum of Seventy Five Thousand One ($75,001) Dollars together with the costs of this action laid out and expended." *Id.* at 4. IIGA now appeals.[2]

### Discussion

The facts in this case are undisputed. The parties disagree as to the meaning of a portion of the Act regarding covered claims. Such questions of statutory interpretation are reviewed *de novo*. *Lake County Auditor v. Burks*, 802 N.E.2d 896, 898 (Ind.2004).

A question of statutory interpretation is a matter of law to be determined by this court. We are not bound by a trial court's legal interpretation of a statute and need not give it deference. We independently determine the statute's meaning and apply it to the facts before us.

*Perry–Worth Concerned Citizens v. Bd. of Comm'rs of Boone County*, 723 N.E.2d 457, 459 (Ind.Ct.App.2000) (citations omitted), *trans. denied.*

■ The statutory language at issue is as follows:

In the case of claims arising from bodily injury, sickness, or disease, including death resulting therefrom ... the amount for which [IIGA] shall be obligated shall not exceed the claimant's reasonable expenses incurred for necessary medical, surgical, x-ray, and dental services, including prosthetic devices and necessary ambulance, hospital, professional nursing, and funeral services and *any amounts actually lost by reason of the claimant's inability to work and earn wages or salary or their equivalent that would otherwise have been earned in the normal course of such injured claimant's employment* ....

Ind.Code § 27–6–8–7(a)(i)(1) (emphasis added) ("Section 7(a)(i)(1)"). IIGA contends that the phrase "amounts actually lost by reason of the claimant's inability to work" includes claims for lost wages of living claimants through the date of settlement or judgment and excludes claims for lost wages of deceased claimants. BRMC argues that we should interpret the statute to include the lost wages of deceased claimants through the date of settlement or judgment. This is a question of first impression in Indiana.

---

2. We heard oral argument in this case on December 13, 2005, in Indianapolis. We commend counsel for the quality of their presentations, which assisted us in our deliberations.

## I. Ambiguity

The threshold question we must resolve is whether the statutory language at issue is ambiguous. "Where a statute previously has not been construed, the interpretation is controlled by the express language of the statute and rules of statutory construction. When a statute is clear and unambiguous on its face, the court need not, and indeed must not interpret the statute." *Cullimore v. St. Anthony Med. Ctr., Inc.*, 718 N.E.2d 1221, 1225 (Ind.Ct.App.1999). Rather, we must give the statute its plain and clear meaning. *Id.*

IIGA argues that the phrase "amounts actually lost by reason of the claimant's inability to work and earn wages" is clear and unambiguous and is not defined by the Act; thus, it should be given its plain meaning. IIGA correctly notes that when the legislature has not defined certain words, we are to assign those words their common and ordinary meaning, which we may determine by consulting English language dictionaries. *UFG, LLC v. Southwest Corp.*, 784 N.E.2d 536, 545 (Ind.Ct.

App.2003), *trans. denied*. Dictionary definitions of "actual" include "[e]xisting in fact or reality[,]" "[b]eing, existing, or acting at the present moment; current[,]" and "[b]ased on fact." THE AMERICAN HERITAGE DICTIONARY 77 (2nd ed.1991). According to IIGA, a claim for the future lost wages of a deceased claimant is "based upon projected or potential wages" and thus "does not fall within the scope of 'amounts actually lost.'" Appellant's Br. at 14.

IIGA also contends that the phrase "inability to work" refers only to a living individual, citing an appellate decision from another jurisdiction, *Flanagan v. Liberty Mutual Insurance Co.*, 383 Mass. 195, 417 N.E.2d 1216 (1981). In *Flanagan*, the Supreme Judicial Court of Massachusetts concluded that in the context of personal insurance protection benefits under the Massachusetts no-fault insurance law, the phrase "amounts actually lost by reason of inability to work and earn wages" contemplates a living individual. *Id.* at 1220. The court stated that "the common sense meaning of 'inability to work' does not include inability due to death." *Id.*[3]

---

**3.** Both IIGA and BRMC cite a Tennessee Court of Appeals case, *Terminix International Co. Limited Partnership v. Tennessee Insurance Guaranty Ass'n*, 845 S.W.2d 772 (Tenn.Ct. App.1992), in support of their respective positions. Of course, the *Terminix* case is not binding upon us, as it was decided in another jurisdiction; however, both parties urge us to apply the *Terminix* court's reasoning to our analysis in the instant case. Like Indiana's Act, the TIGA Act covers claims for "any amounts actually lost by reason of claimant's inability to work and earn wages or salary or their equivalent that would otherwise have been earned in the normal course of such injured claimant's employment." TENN. CODE ANN. § 56–12–107(a)(1)(B). In *Terminix*, the appeals court held that the Tennessee Insurance Guaranty Association ("TIGA") was not obligated to cover the lost future earnings (meaning those incurred *after* settlement or judgment) and lost earning capacity of living claimants.

The case involved two claims, one for an injured adult male's future lost wages, and one for an injured seven-year-old's lost earning capacity. The Tennessee Court of Appeals concluded that it "stretches the imagination" to include future wages within the category of "amounts actually lost." *Terminix*, 845 S.W.2d at 777. The Court stated: "We are of the opinion that finding TIGA's obligation to be limited to medical expenses and lost wages actually incurred is not a misreading of the statute, but is the plain reading of the statute and is the correct interpretation." *Id.* at 776. IIGA contends that the *Terminix* court's reasoning supports its position in the instant case.

BRMC notes that the *Terminix* court did not consider the issue at the center of the instant case—that is, whether a *deceased* claimant can recover lost wages. The court simply ruled that in the case of a living claimant, lost wages incurred beyond the settlement or judgment date are not covered. BRMC con-

We disagree with IIGA's assertion that the determination of a deceased claimant's lost wages through the date of settlement or judgment would be more reliant upon evidence of projected or potential wages than the determination of the lost wages of a living claimant. Presumably, the same type of evidence would be used to prove both kinds of cases. The representative of a deceased claimant would present proof of the decedent's salary at the time of his death and of the amount that he would have earned if he had been alive and employed until the date of settlement or judgment. A living claimant would present evidence of his salary on the date of his injury and of the amount that he would have earned from that date until the date of settlement or judgment if the injury had not occurred. Therefore, it seems that both types of losses—the lost wages of a living claimant and the lost wages of a deceased claimant—could be considered "amounts actually lost" under Section 7(a)(i)(1). In our view, however, it is also reasonable to consider that "inability to work" contemplates a living individual and that only a living claimant can actually "lose" wages within the meaning of Section 7(a)(i)(1). Therefore, IIGA and BRMC's respective interpretations of "amounts actually lost" are reasonable in the context of Section 7(a)(i)(1), and we conclude that the "amounts actually lost" language of Section 7(a)(i)(1) is not clear and unambiguous.

## II. Legislature's Intent

■■■ Because the language at issue in Section 7(a)(i)(1) is subject to more than one reasonable construction, we must ascertain and give effect to the legislature's intent. *See Indiana Ins. Guar. Ass'n v. Blickensderfer*, 778 N.E.2d 439, 442 (Ind. Ct.App.2002).

In determining the legislative intent, the language of the statute itself must be examined, including the grammatical structure of the clause or sentence in issue. If possible, effect and meaning must be given to every word, and no part of the statute is to be held meaningless if that part can be reconciled with the rest of the statute. Further, a statute is to be examined and interpreted as a whole, giving common and ordinary meaning to words used in the English language and not overemphasizing

---

tends that just like a living claimant, a deceased claimant suffers lost wages between the time of the incident and the time of the settlement, and *Terminix* does not hold that such wages are not covered.

Counsel for BRMC cited (at oral argument only) two unreported Tennessee Court of Appeals cases, *Graves v. Jeter*, 2004 WL 3008871 (Tenn.Ct.App. Dec.21, 2004), and *Lawrence v. Town of Brighton*, 1998 WL 749418 (Tenn.Ct. App. Oct.28, 1998). Upon further review of both cases, we find that they are personal injury actions in which the plaintiffs sought damages for their inability to work, among other things. Graves filed suit to recover lost wages and lost earning capacity, while Lawrence sought recovery for lost earning capacity. Indiana law recognizes a difference between lost wages and impairment of earning capacity, the latter being the difference between the amount that a person is capable of making before the injury and the amount that he is capable of earning thereafter. *Scott v. Nabours*, 156 Ind.App. 317, 320–21, 296 N.E.2d 438, 441 (1973). IIGA appears to be correct in its position that impairment of earning capacity contemplates a living claimant, as Indiana courts have generally discussed the concept in terms of a claimant being forced to change careers, or failing to advance in his career, because of his injury. *See, e.g., Montgomery Ward & Co. v. Gregg*, 554 N.E.2d 1145, 1164–65 (Ind.Ct.App.1990), *trans. denied* (1991). Like *Terminix*, these cases are from a foreign jurisdiction and do not address the specific issue in the instant case. Further, they were not decided in the context of TIGA, and they are unreported. For all these reasons, we find them unpersuasive.

a strict literal or selective reading of individual words.

*Indiana Ins. Guar. Ass'n v. Kiner,* 503 N.E.2d 923, 926 (Ind.Ct.App.1987). We should also consider "the occasion and necessity for the law, the causes which induced its enactment, as well as the remedy to be afforded and the benefits to be derived." *City of Muncie v. Peters,* 709 N.E.2d 50, 56 (Ind.Ct.App.1999), *trans. denied.*

In creating the Act, the Indiana legislature relied upon the Insurance Guaranty Model Act promulgated by the National Association of Insurance Commissioners. As IIGA points out, certain modifications made by the Indiana legislature are relevant to this case. Most notably, the Model Act does not limit a state guaranty association's liability in bodily injury cases to medical expenses incurred and actual lost wages. We have recognized the uniqueness of our state's version before: "Unlike other states, Indiana adds another limitation in Section 7(a)(i)(1): Bodily injury claims and judgments limit the Association's obligation to reasonable medical and hospital expenses and actual lost wages, among other things." *Kiner,* 503 N.E.2d at 927 n. 9. In fact, only Missouri, Nebraska, and Tennessee have included similar limiting provisions in their Insurance Guaranty Acts.[4]

We note that the Indiana provision limits a "covered claim" to "reasonable expenses incurred" for medical and funeral services, and "amounts actually lost" for the claimant's inability to work. *See* Ind. Code § 27–6–8–7(a)(i)(1). IIGA argues that the provision, read as a whole, is consistent in excluding from recovery all future or projected losses, including lost wages of a deceased claimant. Also, IIGA makes much of the fact that Indiana is the only state to have altered the Model Act by adding the word "excessive" to modify "financial loss." Appellant's Br. at 6. According to IIGA, "[t]he clear implication of this additional word is that the Guaranty Act is not designed to protect claimants from all financial loss, but only from a certain type of financial loss which is deemed by the legislature to be 'excessive.'" *Id.* We note, however, that the Model Act's version of this provision states that one purpose of the act is to "minimize financial loss to claimants and policyholders." Appellant's App. at 101. It appears, then, that the Model Act also contemplates that the claimant and policyholders will bear some risk of loss.

The Indiana legislature explained the purposes of the Act as follows:

> The purpose of this chapter is to provide a mechanism for the payment of claims under certain insurance policies to avoid excessive delay in payment and to avoid excessive financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of this protection among insurers.

Ind.Code § 27–6–8–2. Another panel of this Court drew some conclusions about the legislature's intent in *Indiana Insurance Guaranty Association v. William Tell Woodcrafters, Inc.,* 525 N.E.2d 1281 (Ind.Ct.App.1988), *trans. denied* (1989):

> [IIGA] is intended to provide a cushion for insureds and claimants when the insolvent insurer is unable to pay claims

4. Missouri's Act appears to provide for the recovery of future lost wages, at least for a living claimant, as it states that a claim may include "any amounts lost *or to be lost* by reason of claimant's inability to work and earn wages or salary or their equivalent." Mo. Rev. Stat. § 375.775(3) (emphasis added).

pursuant to the policies it has issued. The Association does not completely step into the shoes of the insolvent insurer, however . . . .

The dollar limitation set forth in IND. CODE 27–6–8–7(a)(i) limiting the [IIGA's] obligation to $50,000 per claim and $100,000 per occurrence and the clause limiting all other costs and expenses to $1000 make clear that the legislature did not intend to place all risk of loss upon the [IIGA]. The risk of loss for amounts exceeding these figures has been assigned to the insureds.

*Id.* at 1286. Clearly, the legislature intended to provide less protection to claimants than was otherwise provided by the Model Act.

BRMC suggests that an alternative explanation of "amounts actually lost" is that the legislature intended to eliminate the risk of double payments to an injured plaintiff who might recover twice for lost wages under the collateral source rule. For most of the twentieth century, it was the law in Indiana that "[c]ompensation for the loss received by plaintiff from a collateral source, independent of the wrongdoer, as from an insurance company, cannot be set up by the wrongdoer in mitigation of damages." *Aldridge v. Abram & Hawkins Excavating Co.*, 474 N.E.2d 107, 108 (Ind. Ct.App.1985), *trans. denied.* Therefore, argues BRMC, the legislature included the word "actually" in Section 7(a)(i)(1) to prevent recovery under the Act for lost amounts that had been already been paid to the claimant from another source. Today such language would be unnecessary

because, pursuant to legislation enacted in 1986, evidence of payment from collateral sources can now be introduced to reduce an injured plaintiff's recovery. *See* Ind. Code § 34–44–1–2.

We agree with IIGA's position that the Indiana legislature addressed the issue of double recovery within the Act itself by defining "covered claim," in part, as *"an unpaid claim which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this chapter applies issued by an [insolvent] insurer."* Ind.Code § 27–6–8–4(4) (emphasis added). Therefore, the collateral source rule is irrelevant to our construction of the pertinent statutory language.

■ Also, BRMC argues that IIGA's interpretation of Section 7(a)(i)(1) creates an unfair distinction between claims for lost wages of deceased and living claimants:

The wages lost by a dead claimant are just as "lost" up to the date of settlement or judgment as are the wages "lost" by an injured living claimant up to the date of settlement or judgment. Both injured and dead claimants cannot work because of their condition which was created by the alleged negligence of IIGA's insured. The status of "living" versus "dead" is not what has caused the loss of wages; it is the inability to work due to the negligent conduct of the tortfeasor.

Appellee's Br. at 17–18.[5] We agree that the exclusion of lost wage claims of de-

---

5. BRMC alleges that IIGA has been inconsistent in its position regarding payment of lost wage claims of deceased claimants. BRMC claims that IIGA, through the affidavit of Claims Manager Jon Madsen, essentially admitted to the trial court that the Act allowed recovery for lost wages of a deceased claimant through the date of settlement or judg-

ment. We disagree. Our review of the record indicates that IIGA has been consistent in its position that Brown's lost wage claim is not a covered claim under the Act because, in its view, a deceased person cannot lose wages. As IIGA points out, Madsen's affidavit clearly states that "IIGA does not pay the lost wages of a deceased claimant" because

ceased claimants under Section 7(a)(i)(1) is not necessarily logical, particularly because the same type of evidence would be presented to prove both kinds of claims. As IIGA points out, however, it is not within our province to take from or to enlarge the meaning of a statute by reading into it language that would, in our opinion, correct any supposed omissions or errors therein. *See, e.g., Payne v. State,* 396 N.E.2d 439, 441 (Ind.Ct.App.1979).

In sum, we conclude that Section 7(a)(i)(1) of the Act is ambiguous and, therefore, requires construction. The legislative intent, as stated in the Act, is to avoid excessive financial loss to claimants or policyholders because of the insolvency of an insurer. We further conclude that the legislature intended to provide less protection to claimants under the Act than was otherwise provided by the Model Act. Thus, the legislature intended for claimants and policyholders to bear part of the risk of loss. Section 7(a)(i)(1) of the Act limits coverage for bodily injury or death to amounts *actually* lost. Given the common and ordinary meaning of "actual" and the legislative intent behind the Act, we hold that IIGA is not obligated under the Indiana Insurance Guaranty Act to pay a claim for the lost wages of a deceased claimant.

Reversed.

NAJAM, J., and BARNES, J., concur.

they are not considered "actually lost." Appellant's App. at 121.